EMMA M. SEWELL v. THE ATCHISON, TOPEKA & SANTA FE RAILWAY COMPANY.*

No. 15,081. (96 Pac. 1007.)

### SYLLABUS BY THE COURT.

1. CONTRACTS—*Release from Liability for Negligence—Express Messenger.* Where an express company contracts with the railway company by means of whose trains it carries on its business that it assumes all risk of injury to its employees and undertakes to save the railway company harmless from any claims with respect thereto, and contracts with one of its employees that neither it nor the railway company shall be liable to him for any injury occurring to him while traveling on any of such trains in the course of such employment, such employee can not maintain an action for injuries received while so traveling in consequence of the negligence of the agents of the railway company.

2. DEATH BY WRONGFUL ACT—*Waiver of Right of Action.* Where one has made a valid contract which would prevent him from

---

* At the time the original opinion was filed Mr. Justice GREENE, who died July 28, 1907, was a member of the court and was one of the four justices who voted to affirm the judgment. On the rehearing his successor, Mr. Justice BENSON, voted with the three justices who had formerly been in the minority to reverse the judgment of the trial court. The case is now pending in the supreme court of the United States on a writ of error allowed July 15, 1908.—REP.

1—78 KAN.

maintaining an action in his own behalf on account of an injury received through the negligence of another, if his death results in consequence of such injury no action can be maintained therefor in behalf of his widow or next of kin under the statute (Gen. Stat. 1901, § 4871) which gives an action for wrongful death if the decedent might have maintained one if he had lived.

Error from Wyandotte court of common pleas; WILLIAM G. HOLT, judge. First opinion filed July 5, 1907. Affirmed. Rehearing allowed September 21, 1907. Second opinion filed May 9, 1908. Reversed. Opinion denying a petition for a second rehearing filed July 3, 1908.

*C. F. Hutchings, S. D. Hutchings, McFadden & Morris,* and *Ashley, Gilbert & Dunn,* for plaintiff in error.

*William R. Smith, A. A. Hurd,* and *Angevine & Cubbison,* for defendant in error.

*Ware, Nelson & Ware,* as *amici curiæ.*

The opinion of the court was delivered by

MASON, J.: Jefferson D. Sewell, a messenger of the Wells-Fargo Express Company, while engaged in that service was killed in a wreck on the road of the Atchison, Topeka & Santa Fe Railway Company. His widow, Emma M. Sewell, brought an action against the railway company, alleging that its negligence caused the death. The case was submitted upon an agreed statement of facts, from which it appeared that the express company and the railway company had entered into a contract by which the former assumed all risk of injury to its employees and agreed to hold the latter harmless from all loss, cost and damage arising therefrom, and that Sewell had executed a contract with the express company which included a provision that neither it nor any railway company on whose line he might travel in the course of his employment should under any circumstances be liable for any injury occurring to him while so traveling. The trial court

held that the defendant was not liable and gave judgment accordingly, from which the plaintiff prosecutes error.

Two questions are presented: (1) Were the contracts referred to effective to relieve the railway company from liability to Sewell for any injury he received occasioned by the negligence of its agents while he was engaged in his work upon one of its trains? (2) If so, did this waiver of any claim upon his own behalf take away the right of his heirs to recover in the event of his death as the result of such an injury?

It was of course competent for the messenger, as between himself and the express company, to assume any risks of his employment resulting from the negligence of the railway company. The question involved is whether he could contract away his right to compensation for the results of such negligence, as between himself and the railway company, with which he was brought into privity through its contract for indemnity with the express company. It has often been stated as a general principle that no contract will relieve a common carrier from liability for the consequences of the negligence of its agents to one who is a passenger for compensation. (6 Cyc. 578.) There is abundance of authority that an express messenger is a passenger (6 Cyc. 543, note 47), and as he is present upon the train in pursuance of an agreement from which the railway company receives a financial benefit he is essentially a passenger for hire. (Note, 61 Am. St. Rep. 98.) This consideration is sometimes spoken of as controlling upon the question of the power to waive claims for damages caused by negligence; but while language to that effect may be appropriate to some situations, it is not so to that here presented. The messenger is a passenger in the sense that he is not a mere licensee, a trespasser, nor an employee of the railroad company, but one who, through his employer, the express company, has bargained for the privilege of riding upon the train. He is not a passenger in the sense that his primary ob-

ject in so doing was to be conveyed from one point to another. The definitions that have been given of the word "passenger" are nearly as numerous as the different occasions that have arisen to state its meaning. (See 6 Words & Ph. Jud. Def. 5218.) It is not necessary that a definition of universal application should be framed. The important question is whether one in the situation of Sewell could make a valid contract releasing the railway company from liability for the results of its ordinary negligence. Or, to state it in the form of a definition, whether he was a passenger within the meaning of the rule that a passenger can not make such a contract.

The most complete discussion of the very matter here involved to be found in the books is that supporting the decision in *Baltimore & Ohio &c. Railway v. Voigt,* 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, where a conclusion is reached in accordance with the judgment of the trial court in this case. If the judgment is to be affirmed it must be upon the theory adopted by the federal supreme court and for the reasons adduced in the opinion written by Mr. Justice Shiras, from which Mr. Justice Harlan alone dissented. In that opinion the question whether the messenger is properly to be described as a passenger is not treated as necessarily decisive. The argument may be thus summarized: Ordinarily persons may make such contracts as they see fit and the courts are required to give them effect. A common carrier, however, in virtue of its character as such, is under partial disability in this regard. The law imposes upon it certain obligations, of which it can devest itself by special contract only when such contract is one which the courts will regard as fair under all the circumstances. Ordinarily it is not fair that a common carrier should be permitted to absolve itself by contract from the consequences of its own negligence in the carriage of either goods or of passengers; and so, ordinarily, such a contract will be held void. But the reason why such a contract is held unconscionable, and

Sewell v. Railway Co.

therefore unenforceable, is that the common carrier when acting in that capacity does not deal on equal footing with its customer.  He has the right to require it to serve him, and to do so upon terms of equality with other customers.  He really invokes this right whenever he makes a shipment of goods or offers himself as a passenger in the usual course of business, notwithstanding he may be granted some nominal or even substantial concession, such as a reduction from the schedule charge.  He is in no position to drive a bargain.  He requires and must have the services of the carrier.  He must take them upon such terms as it offers.  And if in such circumstances he assents that he will bear his own risk of loss or injury resulting from its negligence the agreement will be regarded as in effect extorted from him and ineffectual to bind him.  But in relation to the carriage of express matter railroad companies do not act as in ordinary cases.  As to such traffic the services they perform are not done as public carriers but under a private contract.  They are not bound to undertake such business at all.  They do not hold themselves out to the public as engaged in that business.  And while in fact they do generally or universally undertake it, they do so in virtue of special contracts, which are entered into by them with only a few organizations throughout the entire country, and ordinarily with but one of them over the same route.  A contract made between a railway company and an express company under such circumstances requires no supervision by the courts, and their interference with it would be unjustifiable.  The shipper is as able as the carrier to protect its own interests and to resist the imposition of any inequitable conditions.  The agreement therefore must be upheld. The express company, having effected a valid assumption of all risks of injury to its employees, is under no disability to transfer such risk to them as a part of the agreement of employment, for the negligence contracted against is not its own but that of the railway company.

That in the foregoing synopsis the grounds upon which courts may set aside contracts by which common carriers seek to limit their liability as such are correctly stated appears from the discussion in *Railroad Company v. Lockwood*, 84 U. S. 357, 21 L. Ed. 627, where it was held that a drover accompanying stock in shipment might recover for injuries to himself resulting from the railway company's negligence, notwithstanding his execution of a contract expressly waiving his right to do so in consideration of certain privileges said to have been given him in addition to those ordinarily granted to shippers. In the opinion it was said:

"The carrier and his customer do not stand on a footing of equality. The latter is only one individual of a million. He can not afford to higgle or stand out and seek redress in the courts. His business will not admit such a course. He prefers, rather, to accept any bill of lading, or sign any paper the carrier presents; often, indeed, without knowing what the one or the other contains. In most cases, he has no alternative but to do this, or abandon his business. In the present case, for example, the freight-agent of the company testified that though they made forty or fifty contracts every week like that under consideration, and had carried on the business for years, no other arrangement than this was ever made with any drover. And the reason is obvious enough—if they did not accept this, they must pay tariff rates . . . being a difference of three to one. Of course no drover could afford to pay such tariff rates. This fact is adverted to for the purpose of illustrating how completely in the power of the railroad companies parties are; and how necessary it is to stand firmly by those principles of law by which the public interests are protected.

"If the customer had any real freedom of choice, if he had a reasonable and practicable alternative, and if the employment of the carrier were not a public one, charging him with the duty of accommodating the public in the line of his employment, then, if the customer chose to assume the risk of negligence, it could with more reason be said to be his private affair, and no concern of the public. But the condition of things is entirely different, and especially so under the modified arrange-

ments which the carrying trade has assumed. The business is mostly concentrated in a few powerful corporations, whose position in the body politic enables them to control it. They do, in fact, control it, and impose such conditions upon travel and transportation as they see fit, which the public is compelled to accept." (Page 379.)

In contrast with the attitude in which these contracting parties stand to each other the relations between the express agent and the railroad company were thus stated in the Voigt case:

"It is evident that, by these agreements, there was created a very different relation between Voigt and the railway company than the usual one between passengers and railroad companies. Here there was no stress brought to bear on Voigt as a passenger desiring transportation from one point to another on the railroad. His occupation of the car, specially adapted to the uses of the express company, was not in pursuance of any contract directly between him and the railroad company, but was an incident of his permanent employment by the express company. He was on the train, not by virtue of any personal contract right, but because of a contract between the companies for the exclusive use of a car. His contract to relieve the companies from any liability to him, or to each other, for injuries he might receive in the course of his employment, was deliberately entered into as a condition of securing his position as a messenger. His position does not resemble the one in consideration in the Lockwood and similar cases, where the dispensation from liability for injuries was made a condition of a transportation which the passenger had a right to demand, and which the railroad companies were under a legal duty to furnish. Doubtless, had Voigt only desired the method of transportation afforded the ordinary passenger, he would have been entitled to the rule established for the benefit of such a passenger. But this he did not desire. He was not asking to be carried from Cincinnati to St. Louis, but was occupying the express-car as part of his regular employment, and as provided in a contract which, as we have seen, the railroad company was under no local compulsion to enter into." (*Baltimore & Ohio &c. Railway v. Voigt*, 176 U. S. 498, 512.)

The vital question is whether in the eye of the law an express company really stands upon any different footing in this respect from any other shipper. That in any particular case it happens to be a powerful corporation can not affect the matter. An individual who had bargained for the right to carry merchandise for his neighbors upon periodical trips to and fro between his home and some commercial·center would doubtless be subject to the same rule. Whether a railway company acts as a common carrier in permitting ·express companies to make use of its facilities for transportation was elaborately considered in the *Express Cases*, 117 U. S. 1, 6 Sup. Ct. 542, 628, 20 L. Ed. 791, and a negative answer was ˙there given. The conclusion reached by the court, and concurred in by all the justices but three (Justices Miller and Field dissenting and Justice Matthews not sitting), was that a railway company is under no duty to handle the business of any express company, and that by undertaking to do so for one company it does not incur an obligation to offer equal privileges to others. This decision has been regarded as settling the question, and recent adjudications are generally if not universally in harmony.with it (6 Cyc. 374, par. 5; 12 A. & E. Encycl. of L. 543, note 2.) But the ·earlier cases showed a tendency to the contrary. (See the second paragraph of the note last cited, and especially *New England Express Company v. Maine Central Railroad Company*, 52 N. H. 430, 13 Am. Rep. 72, cases which, although affected by local statutes, were avowedly based upon common-law principles.)

However desirable it may be in theory to insist upon a railway company's offering no facility to one person or corporation that it will not extend upon equal terms to any other, as a practical matter few concerns are engaged in the express business, and the number is not capable of any large increase, for in the nature of things it must be exclusive or substantially so as to each line of railroad. If under the law any applicant has a

right to the same opportunity at the hands of a railway company to conduct an express business upon its lines that is granted to any other, it would seem that anything like a general exercise of the right would inevitably result in the carrier's being compelled either to abandon the business altogether or to take it absolutely into its own control. We acquiesce in the distinction made between the situation of the individual shipper and that of an express company, between the attitude toward the railroad company of the ordinary passenger and that of an express messenger, and, as a necessary sequence, in the conclusion that the contract in question was valid and effectually waived the right of Sewell to look to the railway company for compensation for any injury he might suffer through the negligence of its agents. This conclusion is in accordance with the weight of authority. (6 Cyc. 579; 2 Hutch. Car., 3d ed., § 1018.) In the last-named work, at the place indicated, it is said:

"A contract between a railroad company and an express company that express messengers shall assume the risk of all accidents or injuries they may sustain in the course of their employment is not void as unreasonable or against public policy. And, if an express messenger actually consents to be bound by the terms of such a contract, there can be no doubt that the contract may be pleaded in bar of any action brought by the express messenger against the railroad company for injuries received in the course of his employment."

And in volume 4 of the second edition of Elliott on Railroads, section 1645, it is said:

"The adjudged cases hold that express messengers are passengers, and while it may be true that express messengers are in a limited sense passengers, yet we think they can not be regarded as passengers in the broad sense in which persons who pay fare as ordinary travelers journeying from place to place are passengers, for there is a duty to carry such persons, but according to the decisions in the *Express Cases*, a public carrier is not under a duty to carry for express companies. A railroad company may, as we have elsewhere

shown, make special contracts with express companies and may grant to one express company exclusive privileges. As a railroad company is not bound as a public carrier to carry the goods or employees of an express company, it may, upon the principle we have stated, make a valid contract exempting it from liability for injuries to express messengers."

The cases are so thoroughly reviewed in the opinion in the Voigt case as to make unnecessary any reference to those already decided when that was written. Additional cases, including *Peterson v. C. & N. W. R. Co.,* 119 Wis. 197, 96 N. W. 532, 100 Am. St. Rep. 879, are cited in Cyc. Ann. to 6 Cyc. 579, note 51. Three cases of a contrary tendency are *Shannon v. Ches. & O. R. Co.,* 104 Va. 645, 52 S. E. 376, *Davis ·v. Chesapeake & O. Ry. Co.* (Ky.), 92 S. W. 339, 5 L. R. A., n. s., 458, and *T. & P. Ry. Co. v. Fenwick,* 34 Tex. Civ. App. 222, 78 S. W. 548. The first, however, was controlled by the fact that the railroad company was not privy to the contract by which the express agent undertook to assume the risk of his employment. In the second, reliance was placed upon a provision in the Kentucky constitution that "no common carrier shall be permitted to contract for relief from its common-law liability," but the reasoning adopted would have led to the same result irrespective of this consideration. The third also was influenced by local laws. The Voigt case was decided against the railroad company by the circuit court upon the theory that the decision in *Railroad Company v. Lockwood,* 84 U. S. 357, 21 L. Ed. 627, established for the federal courts a different rule upon the subject from that which had already been definitely announced by the courts of last resort of Indiana and Massachusetts and has since been followed by those of Illinois and Wisconsin. Mr. Justice Harlan based his dissent from the conclusion of the supreme court "upon the broad ground that the defendant corporation could not, in any form, stipulate for exemption from responsibility for the negligence of its servants or employees in the course of its

business whereby injury comes to any person using its cars, with its consent, for purposes of transportation." (176 U. S. 520.)   Consistently with the view so expressed the same justice, together with Mr. Justice McKenna, also dissented in *Northern Pacific Railway Co. v. Adams*, 192 U. S. 440, 24 Sup. Ct. 408, 48 L. Ed. 513, where it was held that one accepting a free pass might make a valid contract releasing all claims on account of any injuries he might receive while using it on account of the ordinary negligence of the carrier's employees.   This is a question upon which there is some conflict in the decisions, but those holding an agreement so made to be void as against public policy obviously must rest upon some other consideration than a want of equality between the contracting parties.

Having determined, then, that Sewell had effectively waived any claim on his own part, it remains to consider whether as a result of such waiver the claim of his widow was defeated.   The relation of the right of a person to recover damages which he sustains from a personal injury negligently inflicted upon him by another to the statutory right of his heirs to maintain an action (or to have an action maintained in their behalf) for their own loss occasioned thereby in case his death results has been frequently considered by the courts.   The plaintiff in error regards *Railway Co. v. Martin*, 59 Kan. 437, 53 Pac. 461, as committing this court to the proposition that the injured person can not by his contract in any way affect the right of the beneficiary of the statute.   There the decedent had contracted that any liability for injuries he might receive through the negligence of another should not exceed $1000.   The limitation was held to have no effect upon the amount the heirs might recover.   In the opinion it was said:

"It is an action instituted by his widow as administratrix,   .   .   .   for the benefit of herself and the children of the deceased.   It is to recover their damages resulting from the death of the husband and father.   It is to recover for the injury to them rather than to the

deceased. Against their rights the deceased had no authority to contract. The cause of action for which the plaintiff sues never accrued to him. It could only accrue as a result of his death. His stipulation, even if binding on himself, is no defense against the statutory right of the plaintiff." (Page 448.)

The only question there involved, however, was whether a valid limitation upon the amount the injured person could recover for himself imposed a like limitation upon the amount to be recovered in behalf of his heirs. All that was said in the opinion was said with reference to that question, and no other was determined —certainly not the question here presented. That the case was rightly decided is apparent. Whatever connection there may be between the two actions or the two causes of action, there is none between the amounts that can respectively be sued for in each. He who receives the injury can recover for whatever loss he can prove he has suffered. Whether his own loss be much or little, his heirs, if they can recover at all, can recover to the full extent of their actual damages—within the limits fixed by law—but no more. Therefore a restriction upon the possible amount of his recovery can have no effect upon the extent of theirs. This is a consideration seemingly overlooked in *I. C. R. R. Co. v. Cozby*, 69 Ill. App. 256, where it was said : "If the husband can not limit the amount of the recovery, much less can he take away the right of recovery altogether." (Page 262.)

Essentially the two causes of action referred to, although based upon the same wrongful act, are separate and distinct. Logically there is no reason why two actions should not be instituted and prosecuted to a conclusion—one by the injured person for the loss that results to him from the defendant's wrong, and the other by those dependent upon him on account of the support of which they are deprived by his death, just as each spouse may sue for damages consequent upon a tortious injury done to the wife. A plausible argument might

originally have been made that such was the purpose and effect of the Kansas statute (inasmuch as it provides [Civ. Code, § 420] that causes of action for injuries to the person shall survive), and that where the plaintiff in the first action died it might be revived and prosecuted to judgment for the benefit of his estate generally, while the second action might also be maintained for the benefit of those immediately dependent upon him.   Under such a statute or such a construction it might well be asserted that the two causes of action were entirely separate and the waiver or satisfaction of one would not affect the other.   But in *McCarthy, Adm'r, v. Railroad Co.,* 18 Kan. 46, 52, 26 Am. Rep. 742, it was decided that the second action was in a sense a substitute for the first—that the first expired beyond revivor whenever the second accrued by the death of the plaintiff in consequence of the tort sued upon.   This view is in accordance with the interpretation usually put upon similar statutes—that while the two causes of action are not the same, one depends upon the other, and any consideration that would be a bar to the first in the lifetime of the plaintiff would destroy the second.   The section of the statute under consideration reads:

"When the death of one is caused by the wrongful act or omission of another, the personal representatives of the former may maintain an action therefor against the latter, if the former might have maintained an action had he lived against the latter for an injury for the same act or omission.   The action must be commenced within two years.   The damages can not exceed $10,000, and must inure to the exclusive benefit of the widow and children, if any, or next of kin, to be distributed in the same manner as personal property of the deceased."   (Gen. Stat. 1901, § 4871.)

In volume 8 of the American and English Encyclopædia of Law, at page 870, it is said:

"When the right of action given by the statute is merely such as the deceased would have had if he had survived the injury, a release properly executed by him

in his lifetime is a complete defense to an action by his personal representative or others to recover damages for his death. The same rule is true where the statute is not a survival statute, but creates a new and distinct cause of action in favor of certain beneficiaries, if it provides that the right of action shall exist only in cases where the deceased himself might have maintained the action had he lived."

And in volume 13 of the Cyclopedia of Law and Procedure, at page 325:

"Upon the question as to whether a release, executed by the deceased for the injury received by him, will continue a bar to an action by his representative or heirs for his death, there is considerable conflict of authority. However, the better rule is that where the party injured has compromised for the injury and accepted satisfaction previous to his death there can be no further right of action, and consequently no suit under the statute, unless it be shown that such compromise or release was procured by fraud or duress."

The conflict referred to, as shown by the notes to the texts quoted, results chiefly from the decisions in Massachusetts and Kentucky construing the statutes of those states as penal rather than compensatory, and on that account upholding the right of the heirs to maintain their action although the personal claim of the decedent had been satisfied. The cases on the subject are collected in *Strode v. St. Louis Transit Co.*, 197 Mo. 616, 95 S. W. 851, where it was said:

"Whether the right of action is a transmitted right or an original right; whether it be created by a survival statute or by a statute creating an independent right, the general consensus of opinion seems to be that the gist and foundation of the right in all cases is the wrongful act, and that for such wrongful act but one recovery should be had, and that if the deceased had received satisfaction in his lifetime, either by settlement and adjustment or by adjudication in the courts, no further right of action existed." (Page 632.)

(See, also, cases cited in 2 Supp. to A. & E. Encycl. of L. 319, Cyc. Ann. to 13 Cyc. 325, note 43, and a full discussion in *Bruns v. Welte*, 126 Ill. App. 541.)

It can hardly be said that the adjudications show a substantial difference of opinion upon this phase of the matter.   In a note on the subject in 70 Am. St. Rep. 684 the editor says, after reviewing the decisions:

"It is somewhat difficult to combat the logic which leads to such a conclusion.   The rule, however, that no action for wrongful death is maintainable, except where deceased himself could have sued had he survived, applies to, as indeed it grew out of, matters pertaining to the nature and cause of the injury which resulted in death.   Was the negligence or wrongful act of defendant the proximate cause of the injury?   If not, deceased could not have recovered against him, nor can his successors under the statute.   Did deceased's contributory negligence cause the injury?   If so, any action for such injury is similarly barred.   If the relation of master and servant subsisted between deceased and defendant, was the injury resultant from the act or neglect of a fellow servant, or was it, for any reason arising out of the rules of master and servant, such an injury as gave rise to no liability on the part of the defendant?   If this is answered affirmatively, and in the two cases mentioned before, no cause of action ever arose which was susceptible of release or compromise. Where, however, a cause of action does arise, and the injured party has a period of suffering and expense, there seems no reason that he should not be able, while living, to make an adjustment of his claim with defendant which would bar a recovery by his beneficiaries after his death upon the same claim.   But the action given under other than survival statutes is entirely distinct from the action which deceased had at the moment prior to his death.   It is an action for damages arising from the mere fact of death, not damages to the deceased, but damages to his successors under the statute. Therefore, we can not comprehend the reasoning which enables an injured person to release a cause of action which has not accrued, and can not accrue until his death, and which then accrues to third persons. · It would be necessary to support such a conclusion that we admit that a person has a right of action for his own death.   A greater degree of absurdity would not be attained in the enactment of a statute making suicide punishable as murder in the first degree."

This argument is ingenious and not lacking in plausi-

bility, but we can not regard it as affording sufficient ground for rejecting the doctrine referred to, which seems to have become thoroughly established as a part of the jurisprudence of statutory actions for death by wrongful act. Nor can we regard it as possible to distinguish between the effect of a settlement made by an injured person after his injury and a contract made by him in advance, founded upon sufficient consideration, and otherwise valid, waiving his right to recover. In principle such a waiver is an acceptance of satisfaction in advance, and in theory at least, whatever the fact may be, one agreeing to such waiver as a part of his contract of employment exacts and receives an addition to his wages sufficient to compensate him for the risk of injury he assumes. The defense based upon such an agreement is essentially that the person injured assumed the risks of his employment—a defense which is recognized as available in actions under the statute referred to. (*Rush, Adm'x, v. Mo. Pac. Rly. Co.*, 36 Kan. 129, 12 Pac. 582.) Such assumption of risk, like contributory negligence, prevents a right of action accruing to him who receives the injury, and is therefore fatal as well to a recovery by his administrator. We are constrained to hold that the contract which would have prevented an action by Sewell in his own behalf also prevents a recovery in behalf of his heirs.

The judgment is therefore affirmed.

GREENE, BURCH, PORTER, JJ., concurring.

JOHNSTON, C. J., SMITH, GRAVES, JJ., dissenting.

---

### OPINION ON REHEARING.

#### SYLLABUS BY THE COURT.

CONTRACTS—*Release from Liability for Negligence—Express Messenger.* In view of the Kansas statutes making a railroad company liable for all damages done to persons or property in consequence of any neglect on its part (Gen. Stat. 1901, § 5857), and for all damages done to any of its employees in consequence of any negligence of its agents or by any mismanagement of its engineers or other employees (Gen. Stat.

Sewell v. Railway Co.

1901, § 5858), although an express company contracts with the railway company by means of whose trains it carries on its business that it assumes all risk of injury to its employees and undertakes to save the railway company harmless from any claims with respect thereto, and contracts with one of its employees that neither it nor the railway company shall be liable to him for any injury occurring to him while traveling on any of such trains in the course of such employment, such employee may still maintain an action against the railway company for injuries received while so traveling in consequence of the negligence of its agents.

The opinion of the court was delivered by

MASON, J.: This case involves the question whether a recovery may be had against a railway company in behalf of the widow of an express messenger who died as the result of an injury received through the company's negligence while traveling in an express-car in the performance of his duties, he having contracted with the express company not to hold either it or the railway company liable for any such injury, and the express company having contracted with the railway company to exempt the latter from liability therefor. Upon the first hearing the conclusion was reached (1) that if the express agent's agreement effectually waived his own right to recover for the injuries he received no right of recovery ever accrued to his widow, and (2) that his contract was valid and did have the effect stated. Three members of the court dissented from the result. Upon the rehearing the court without dissent adopts the view presented in the original opinion that the widow's right to maintain an action depends upon whether her husband could have maintained one; that unless a right of action accrued to him in his lifetime none could accrue at his death to her. The question for present determination is therefore whether the employee of an express company can make a valid contract relieving a railroad company from liability to him for injuries received by him through its negligence while riding in an express-car forming a part of one of

2—78 KAN.

its trains. A majority of the members of the court, not including the writer of this opinion, believe that this question must be answered in the negative, upon considerations now to be stated.

Since the former opinion was written the cases there cited as upholding such contracts, of which *Baltimore & Ohio &c. Railway v. Voigt,* 176 U. S. 498, 20 Sup. Ct. 385, 44 L. Ed. 560, is a type, have been followed in *Robinson v. St. Johnsbury & L. C. R. R. Co.,* 80 Vt. 129, 66 Atl. 814, 9 L. R. A. 1249, and in *D. & R. G. R. R. Co. v. Whan,* 39 Colo. 230, 89 Pac. 39, 11 L. R. A., n. s., 432, the latter being a sleeping-car conductor case, in a note to which, published in 11 L. R. A., n. s., 432, the authorities bearing upon the question involved are carefully and thoroughly collected, classified, and reviewed. It is not necessary now to determine whether this court will accept or reject the doctrine of the federal supreme court announced in the Voigt case. Granting that such doctrine is sound and that the case was rightly decided, it does not follow that the contract made by Sewell was valid. There the question was determined solely upon the principles of the common law; here it is affected by the Kansas statutes. In the course of the opinion the court said:

"The relation of an express messenger to the transportation company, in cases like the present one, seems to us to more nearly resemble that of an employee than that of a passenger. His position is one created by an agreement between the express company and the railroad company, adjusting the terms of a joint business —the transportation and delivery of express matter. His duties of personal control and custody of the goods and packages, if not performed by an express messenger, would have to be performed by one in the immediate service of the railroad company. And, of course, if his position was that of a common employee of both companies, he could not recover for injuries caused, as would appear to have been the present case, by the negligence of fellow servants." (*Baltimore & Ohio &c. Railway v. Voigt,* 176 U. S. 498, 513.)

In Kansas a railroad company, by virtue of the stat-

ute (Gen. Stat. 1901, § 5858), is liable to its employees for injuries occasioned by the negligence of fellow employees, and such liability can not be contracted against. (*K. P. Rly. Co. v. Peavey*, 29 Kan. 169, 44 Am. Rep. 630.)   If in this state a railroad company may by contract relieve itself from liability for injuries to an express messenger resulting from its negligence, it is able to a certain extent to avoid a part of the consequences of the statute cited.   An express company performs for the public services which otherwise the railroad company would perform, and could be required to perform, if not in precisely the same way, at least by some means affording the public substantially the same accommodation.   This is recognized in the opinion of the court in the *Express Cases,* 117 U. S. 1, 6 Sup. Ct. 542, 628, 29 L. Ed. 791, where it was said:

"The real question is not whether the railroad companies   .   .   .   must carry express matter for the public on their passenger-trains, in the immediate charge of some person specially appointed for that purpose.   .   .   .   It is no doubt true   .   .   .   that   .   .   .   'every railroad company   .   .   .   has recognized the right of the public to demand transportation by the railway facilities which the public has permitted to be created of that class of matter which is known as express matter.' "

"The railroad company performs its whole duty to the public at large and to each individual when it affords the public all reasonable express accommodations.   If this is done the railroad company owes no duty to the public as to the particular agencies it shall select for that purpose.   The public require the carriage, but the company may choose its own appropriate means of carriage, always provided they are such as to insure reasonable promptness and security."   (Pages 20, 21, 24.)

The statute (Gen. Stat. 1901, § 1322) recognizes this obligation in the requirements that every railway company must furnish sufficient accommodation for the transportation of "express freight" and shall stop passenger-trains at junctions long enough to allow the transfer of "express freight."

If a railroad company chose to handle all express business itself, without the intervention of any other company, it could not by any contract it could make escape liability to its express messengers for injuries occasioned by the negligence of its other employees. To allow it, by devolving a part of its own proper function upon another corporation, to avoid the responsibility it would otherwise be under to the persons in immediate charge of the business would be to permit it to evade the force of the statute and to accomplish by indirection what the law forbids to be done directly.

This is a consideration which might have been given weight in *Peterson v. C. & N. W. R. Co.*, 119 Wis. 197, 96 N. W. 532, 100 Am. St. Rep. 879, for in Wisconsin the fellow-servant rule has been abolished as to risks peculiar to railroads, but it was not there referred to, the court basing the decision upon the Voigt case, with but little independent discussion. It would also have been pertinent in *Louisville, New Albany & Chicago Railway Co. v. Keefer*, 146 Ind. 21, 44 N. E. 796, 38 L. R. A. 93, 58 Am. St. Rep. 348, for there the injury resulted from a defective bridge, and therefore under the Indiana statute the fellow-servant rule did not apply, but it was not there mentioned. In *Bates v. Old Colony Railroad*, 147 Mass. 255, 17 N. E. 633, however, it was said in so many words that if the railroad had been doing the express business the messenger could not have recovered, and this must have been true in *Blank v. I. C. R. R. Co.*, 182 Ill. 332, 55 N. E. 332, and in *Robinson v. St. Johnsbury & L. C. R. R. Co.*, 80 Vt. 129, 66 Atl. 814, 9 L. R. A., n. s., 1249, for the fellow-servant rule is in force in Illinois and in Vermont. Therefore no one of the cases named can fairly be regarded as an authority for the proposition that where the fellow-servant rule has been abrogated an express company's agent can by contract relieve the railroad company from the consequences of its own negligence; and the list includes all the leading cases on the subject—that is, all the cases by which the law has been settled in an

independent jurisdiction in line with the doctrine of the Voigt case.

In a brief lately filed as friends of the court by counsel for a litigant having a claim similar to that of Mrs. Sewell attention has been called to the fact, which had previously been overlooked by the court, that except as the matter might be affected by the contract the express messenger had a cause of action against the railroad company, not only upon common-law principles, but in virtue of the statute. In 1870 the legislature passed an act declaring "that railroads in this state shall be liable for all damages done to person or property, when done in consequence of any neglect on the part of the railroad companies." (Gen. Stat. 1901, § 5857.) The exact purpose of this enactment is not clear, since the liability it imposes or defines apparently is the same as that which already existed. Referring to it Mr. Justice Brewer, speaking for the court, said in *St. Jos. & D. C. Rld. Co. v. Grover*, 11 Kan. 302:

"Many interesting questions will arise under this section. Did the legislature simply intend to give statutory force to the judicial determinations of the rules and limits of railroad liability? This hardly seems possible, or else they have chosen language most inapt. Evidently they proposed a change. By that change did they seek to wipe out the doctrine of contributory negligence as a defense to a plaintiff's action, and to make the companies liable in every case of negligence on their part, even though the plaintiff's negligence contributed equally or more to the injury? Did they intend to make the companies responsible in all cases for slight negligence?" (Page 306.)

The act has been held not to have abolished the fellow-servant rule (*K. P. Railway Co. v. Salmon, Adm'x.*, 11 Kan. 83, 93) or the defense of contributory negligence (*K. C., Ft. S. & G. Rld. Co. v. McHenry*, 24 Kan. 501). It does not give a right of action for what is called "slight negligence," for this court does not recognize any degrees of negligence. (*Railway Co. v. Walters, post*, p. 39.)

The act making railroad companies liable to their employees for injuries sustained through the negligence of their other employees was passed in 1874, in these words:

"Every railroad company organized or doing business in this state shall be liable for all damages done to any employee of such company in consequence of any negligence of its agents, or by any mismanagement of its engineers or other employees to any person sustaining such damage." (Gen. Stat. 1901, § 5858.)

In the case already cited (*K. P. Rly. Co. v. Peavey,* 29 Kan. 169, 44 Am. Rep. 630) in which it was held that liability under this act could not be waived by contract, the reasons for such holding were thus stated:

"Prior to the statute of 1874, the rule of the common law prevailed in this state, that a master was not liable to his servant for an injury happening in consequence of the negligence of a fellow servant engaged in the same general employment, unless charged with some degree of fault or negligence in the selection or retention of the fellow servant. The legislature of the state has, however, changed the common-law rule, and the statute makes a railroad corporation liable for the negligence of one employee causing injury to a coemployee, without regard to the negligence of the company in selecting or retaining the employee. Whether this legislation be wise, or not, it is not within our province to determine. We must assume that the legislature had satisfactory reasons for changing the rule of the common law, and having adopted the statute, as we may assume for wise and beneficial purposes, we do not think a railroad company can contract in advance for the release of the statute liability. It is a familiar principle of law that a contract made in violation of the statute is void, and also that agreements contrary to the policy of statutes are equally void. . . . Further, while the reasons for the rule of the common law, that the master ought not to be responsible for injuries inflicted upon one servant by the negligence of another servant in the same common employment, seem plausible and correct theoretically, yet we may assume that the legislature did not find the practical operations of the rule as affording sufficient security to persons engaged in the hazardous business of op-

erating railroads; that for the protection of the lives
and limbs of the employees of such companies the legis-
lature deemed it necessary to enact the statute making
these companies liable for all damages done to any of
their employees in consequence of the negligence of a
coemployee.  Now, if the statute was enacted for the
better protection of the life and limb of railroad em-
ployees, it would be against public policy for the courts
to sanction contracts made in advance for the release of
this liability, especially when we consider the unequal
situation of the laborer and his employer.  Take this
illustration: In some states—and in our own—the own-
ers of coal-mines which are worked by means of shafts
are required to make and construct escapement-shafts
in each mine, for distinct means of ingress and egress
for all persons employed or permitted to work in the
mines.  Such a statute is for the benefit of employees
engaged in working in coal-mines; but the owner of
such a mine would not be permitted to contract in ad-
vance with employees for operation of the mine in con-
travention of the provisions of the statute.  The state
has such an interest in the lives and limbs of its citi-
zens that it has the power to enact statutes for their
protection, and the provisions of such statutes are not to
be evaded or waived by contracts in contravention
therewith.  The general principle deduced from the au-
thorities is that an individual shall not be assisted by
the law in enforcing a contract founded upon a breach
or violation on his part of its principles or enactments;
and this principle is applicable to legislative enact-
ments, and is uniformly true in regard to all statutes
made to carry out measures of general policy; and the
rule holds equally good, if there be no express pro-
vision in the statute peremptorily declaring all con-
tracts in violation of its provisions void, in regard to
statutes intended generally to protect the public inter-
ests, or to vindicate public morals."  (Page 175.)

A part of this language is broad enough to apply to
contracts in avoidance of the liabilities defined by one
statute as well as of those imposed by the other; for
instance, this:

"The legislature  .  .  .  having adopted the stat-
ute, as we may assume for wise and beneficial purposes,
we do not think a railroad company can contract in
advance for the release of the statute liability.  It is a

familiar principle of law that a contract made in violation of the statute is void, and also that agreements contrary to the policy of statutes are equally void." (Page 175.)

A statute exhibits the legislative. policy of the state none the less because it is merely declaratory of the common law. Indeed it may reasonably be argued that the only effect of a statute confirming a right of recovery which already existed is to give it a firmer basis, perhaps, by placing it in the class of rights which can not be contracted away. The statute of 1874 was in part declaratory. The only new right of recovery it · gave was to an employee who was injured by the negligent act of his coemployee. It would hardly be contended that a railroad employee can by contract exempt the company from liability in all cases except where his injury was occasioned by the fault of a fellow servant. ·

The statute of 1870, equally with that of 1874, was "made to carry out measures of general policy," and was "intended generally to protect the public interests" and "to vindicate public morals." (*K. P. Rly. Co. v. Peavey, supra.*) It differs from it mainly in being more general in its terms and of broader scope, and in not being exclusively for the protection of railroad employees. The argument based upon the relation of master and servant—the inequality of footing upon which they deal—fails in the case of the earlier act, except as its protection might be invoked by an employee. An express messenger, although employed only by the express company, is within the protection of that act. As to him it is a measure guarding his life and safety while engaged in a business fraught with peculiar peril. While he does not deal directly with the railroad company, his contract is made with his employer, with whom he can not treat on terms of perfect equality. Why may it not be said in his case, as in that of the

Sewell v. Railway Co.

student brakeman in *Railway Co. v. Fronk*, 74 Kan. 519, 87 Pac. 698:

"The state has an interest in the lives, health and safety of its citizens, and whenever a business, although lawful in itself, is dangerous to the lives or injurious to the health of the employees engaged in conducting such business it becomes a question of public concern and the state may intervene in the interest of the public welfare. . . . The protection thus provided by the state for the safety of its citizens is a matter of public concern and can not be contracted away by the individual." (Page 526.)

Iowa has for many years had a statute which in effect combines in one section the provisions of the Kansas acts of 1870 and 1874. It reads:

"Every corporation operating a railway shall be liable for all damages sustained by any person, including employees of such corporation, in consequence of the neglect of the agents, or by any mismanagement of the engineers or other employees thereof, and in consequence of the wilful wrongs, whether of commission or omission, of such agents, engineers or other employees, when such wrongs are in any manner connected with the use and operation of any railway on or about which they shall be employed, and no contract which restricts such liability shall be legal or binding." (Code of Iowa, 1897, § 2071.)

In *O'Brien v. Chicago & N. W. Ry. Co.*, 116 Fed. 502, it was held that in view of this statute the Voigt case had no application to a case arising under the laws of that state. In the opinion it was said:

"In addition to the obligation imposed by the common law, section 2071 of the code of Iowa declares that a railway company shall be liable for all damages sustained by any person resulting from the neglect or mismanagement of any servant, agent or employee of the company in connection with the operation of the railway. In *Rose v. Railway Co.*, 39 Iowa, 246, the state supreme court, in construing this statutory provision, held that it could not be limited to employees only, but that 'the language of the enactment includes all classes of persons sustaining damages from the negligence of the employees of the railroad company.' . . . To

escape this liability is the purpose .of the contracts in question, and under the doctrine announced by the supreme court in the Voigt case, so far as the common law is concerned, thése contracts are to be held valid, and to be sufficient to defeat the liability which otherwise would be imposed upon the railway company for the injuries resulting to the messenger from negligence in handling and transporting the car occupied by him. What effect, however, upon their validity, have the provisions of the statute of · Iowa already cited?  .  .  .  Thus it is declared by the statutory enactment to be the public policy of the state that corporations engaged in the railway business in this state can. not, by contract, free themselves from the liability attaching to them as carriers of passengers and property; that they are liable to every person, including their own employees, for injuries resulting from the neglect, mismanagement or wilful wrongs of the agents or employees of the company engaged in the operation of the railway, and that no contract seeking to restrict such liability shall be legal or binding.  .  .  .  In the face of these provisions of the state statutes, it is impossible to give any force or validity to the contracts relied on by the defendant in this case.  Their clear purpose is to attempt to free the railway company from the liability which the state has seen fit to impose upon the company in the conduct of its business in Iowa, and which the state statute declares can not be evaded by contracts entered into in violation of the provisions of the statutes, and it must be held that the clauses of the contracts which are intended to free the company from liability for injuries caused by its negligence or that of its employees to express messengers, when engaged in their duties upon the trains of the company in Iowa, are invalid, and of no legal force or effect."    (Pages 508, 509.)

Of course the explicit language of the Iowa statute declaring contracts in avoidance thereof illegal compelled the decision there made, but the argument used in the opinion illustrates the view that the provisions for the protection of persons generally and those for the especial benefit of employees are of the same character and equally to be regarded as showing the public

Sewell v. Railway Co.

policy of the state.   In the Peavey case, *supra,* this court said, referring to the Iowa act quoted:

"With our interpretation of the statute of 1874, and the fairly inferred intent of the legislature in enacting it, the omission therefrom of the addition in the Iowa statute, 'and no contract which restricts such liability shall be legal or binding,' does not empower a railroad company to evade its liability by contract."    (29 Kan. 177.)

The reasoning by which that conclusion was reached applies with considerable, if not equal, force to the more general provision which in Iowa is incorporated in the same section with the fellow-servant law, but which in Kansas is covered by a separate enactment.

The decision of the trial court is reversed and the cause remanded, with directions to enter judgment for the plaintiff.

JOHNSTON, C. J., SMITH, GRAVES, BENSON, JJ., concurring.

MASON, J. (dissenting) :  I adhere to the view that the messenger could lawfully contract to relieve the express company from liability for injuries caused by negligence of the railway company, because such negligence was beyond the control of the express company; that the contract between the railway company and the express company was valid because the former was not under any obligation to afford express facilities to the latter, and therefore could attach to its concessions any conditions it saw fit, even to the extent of avoiding liability for its own dereliction; and that the two contracts brought the messenger into privity with the railway company and effectually waived his claim to recover for his injuries.

In the Voigt case the court did not hold that the messenger was an employee of both companies.   Had it done so a reference to the fellow-servant rule would have been sufficient to dispose of every question in-

volved. As was said of this matter in *M'Dermon v. Southern Pac. Co.,* 122 Fed. 669:

"The court did not assert that the express messenger was an employee of the carrier corporation, but that he 'more nearly resembles that of an employee than that of a passenger'; and that his duties of personal control and custody of the express matter, if not performed by the express messenger, would have to be performed by a servant of the railroad company. It is evident that the learned justice presented this thought argumentatively, so that, if it were asserted that such messenger was an employee of [or] a fellow servant, there could be no recovery." (Page 676.)

Of course a railroad company can not escape its statutory or other obligations by operating through another corporation. But express companies are not a device to enable railroad companies to accomplish such an evasion. The express business was originated and has been built up by organizations devoted to that sole purpose, employing carriers already in existence. That situation was well understood when all the statutes referred to were enacted. If through inadvertence or oversight there was an omission to forbid such a contract as that here involved, the result is unfortunate, but the remedy lies with the legislature and not with the courts.

The decision in the Peavey case is manifestly sound, but some of the expressions used in the opinion may be too broad to admit of general application. Not every right of action that is conferred by a statute in pursuance of a public purpose is of such character that it can not be contracted away. Merely by way of illustration—doubtless any one would concede, as the plaintiff did in *Railroad Co. v. Blaker,* 68 Kan. 244, 75 Pac. 71, 64 L. R. A. 81, the validity of a contract exempting a railroad company from liability if it should set fire to a building which it voluntarily permits to be placed upon its right of way, notwithstanding the statute making it liable for fires negligently caused. (See, also, in this connection, *Griswold v. Ill. Cent. R'y Co.,* 90 Iowa, 265.)

And the proposition seems reasonable that generally, wherever a carrier grants a privilege of a different kind from any that could be required of it, it may lawfully impose as a condition that it shall be exempted from some obligation in that connection which it would otherwise owe.

I realize that the decision of the court accords with what one would naturally wish the law should be, and that the questions involved are difficult and doubtful. I dissent with much hesitation. My chief doubt, however, is whether the *Express Cases,* and therefore the Voigt case, were not wrongly decided.

PORTER, J. (dissenting) : The dissenting opinion of Mr. Justice Mason expresses my views.

BURCH, J. (dissenting) : I dissent for the reasons stated by Mr. Justice Mason.

---

OPINION DENYING A PETITION FOR A SECOND
REHEARING.

The opinion of the court was delivered by

MASON, J.: In a petition for a rehearing attention is called to the fact that in ordering a reversal of the judgment the court failed to mention one of the contentions made in behalf of the railway company. The petition is denied, but to remedy the omission noted this addition is made to the opinion already filed:

The defendant in error contends that if the act of 1870 be so construed as to cut off the defense of assumption of risk by contract the statute itself is void because repugnant to the federal constitution, and especially to the fourteenth amendment thereof, citing in support of this contention *K. C., Ft. S. & G. Rld. Co. v. McHenry,* 24 Kan. 501. That case established that the statute did not abolish the defense of contributory negligence, the writer of the opinion adding that such a construction would conflict with the constitutional guaranties of "equity of rights and remedies for injury by due course

of law." (Page 504.) In the present case the court interprets the statute no further than is necessary to determine the precise controversy involved. What is decided is that under the acts of 1870 and 1874 an express messenger can not by contract made in advance relieve a railroad company from liability for injuries received through its negligence while in the performance of his duties upon its cars. In this we discover no conflict with any provision of either the state or federal constitution.