No. 39,533

RIDDLE QUARRIES, INC., a Corporation, *Appellee*, v. GUY A. THOMP-
SON, Trustee, MISSOURI PACIFIC RAILROAD COMPANY, Debtor,
*Appellant.*

(279 P. 2d 266)

Opinion
filed January 22, 1955.

*Ralph M. Hope,* of Wichita, argued the cause, and *John H. Lehman,* of
Abilene, *W. F. Lilleston, George C. Spradling, Henry V. Gott, George Stall-
witz, Richard W. Stavely,* and *Charles S. Lindberg,* all of Wichita, were with
him on the briefs for the appellant.

*David W. Wheeler,* of Marion, argued the cause, and *Edwin G. Westerhaus,*
of Marion, and *Harold Bolton,* of Abilene, were with him on the briefs for the
appellee.

The opinion of the court was delivered by

HARVEY, C. J.: This was an action to recover damages for the
alleged conversion by defendant of agricultural limestone placed
on defendant's right of way by plaintiff under a storage license. A
trial by jury was waived. The court overruled defendant's de-
murrer to plaintiff's evidence and later made conclusions of fact
and of law. Defendant moved to set aside some of the conclusions,
and parts of others. These were overruled, as was defendant's
motion for a new trial. Judgment was rendered for plaintiff for
$1,908.48, with interest from date of judgment. Defendant appeals
from the judgment and all adverse rulings. The amount of the
judgment is not questioned if plaintiff is entitled to recover.

Plaintiff is a Kansas corporation with headquarters at Marion, engaged in the business of buying and distributing agricultural limestone. Defendant is a trustee of a railroad company operating lines, some of which are in Kansas, and has a station on its line at Langley in Ellsworth County, where it has a main track and one side track.

On April 15, 1950, defendant issued to plaintiff a "General Temporary Storage License" in which plaintiff was designated licensee and defendant was designated carrier, and which, so far as here pertinent, reads:

"In consideration of the covenants herein of the undersigned Licensee . . .;

"The undersigned Carrier grants to Licensee permission, to be exercised at Licensee's sole cost and responsibility . . .,

"(1st) temporarily to store certain of the Licensee's Limestone (agricultural) on the portion . . . available at the time of Carrier's . . . existing station grounds at Langley, station, Kansas . . . provided: Licensee shall . . .

"(c) so place or relocate from time to time and so keep any and all property stored hereunder as not to . . ., (4th) interfere with or prevent any use to which the Carrier's right-of-way is then being or is proposed to be put;

"(d) prior to conclusion of term hereof, remove or cause to be removed from Premises all property stored pursuant hereto, . . .

"(g) indemnify and save harmless the Carrier from all liability, damage and expenses, including attorney's fees and costs, which the Carrier may incur or suffer, however caused to or by Licensee, or any employee, agent, bailor or licensee of Licensee, and whether or not caused or contributed to by the negligence of the Carrier, its agents or servants;

"(h) assume the risks of all loss, injury and damage by fire, however caused and whether or not caused by the negligence of the Carrier, its agents or servants; the Licensee in consideration of the use of Premises pursuant to this license hereby agreeing to indemnify and save harmless the Carrier from all liability for damage by fire, however the fire may originate, the risk of which Licensee assumes as aforesaid.

"Term hereof shall begin with April 15, 1950, and continue thereafter until concluded . . . by expiration of ninety days following beginning of term hereof."

This was signed on behalf of the carrier by V. C. Halpin, Superintendent, and for plaintiff by John H. Riddle, as Licensee.

In April, 1950, plaintiff shipped 10 carloads, containing 668 tons, of agricultural limestone and unloaded it on the station grounds at Langley. Much of this was placed in a pile, about 50 feet long and 25 or 30 feet wide, near the tracks. None of it was removed prior

to the conclusion of the term of the license, July 14, 1950. About 52 tons were removed in September, 1950. Plaintiff gave it no further attention until sometime in September, 1951. In the meantime heavy rains, aggregating about 50 inches, had washed the pile down somewhat, spread its base, and caused some of it to be wasted.

On August 14, 1951, defendant's freight train, loaded with lumber, ammunition and other materials usually shipped by freight, was wrecked at the Langley station, and 54 cars left the track. In the mass of wreckage, which extended about 750 feet along the track, cars were piled upon one another, thrown crosswise or endwise, and some thrown off the track. Defendant's Road Master and Car Foreman were called. They responded promptly with workmen, and a derrick to lift cars, and went to work cleaning up the wreckage, most of which was on the main track. The side track had less wreckage upon it and was opened first so trains might get through. Several of the wrecked cars of lumber were thrown against the side of the limestone pile, some of the cars were broken open and some of the lumber spilled on top of the pile. One large box car, loaded with lumber, was thrown in such a way that it was against the side of the limestone pile with one end so close to the track that it had to be moved. Defendant's foreman took a bulldozer and cut off the top of the pile of limestone, spreading the part removed upon the lower portions, perhaps somewhat extended, and dragged this car up on top of it where he could get the doors unlocked and take the lumber out of it. The car was there a few days, then it was taken away. Much of the wrecked material, parts of cars, linings, and the contents of some of them which had been destroyed, were burned at different places near the wreck.

There was conflicting evidence with respect as to whether any material was burned on top of the limestone pile. There was also a controversy as to whether it was salable, and two reasons were suggested why it was not. First, because it had foreign bodies in it that would prevent it from going through the spreaders that are so geared they cannot take objects over an inch or so in diameter; second, that the limestone had been so damaged that it would not meet the government's specifications. Mr. Riddle, testifying for plaintiff, expressed the view that it would not; but said:

". . . To my knowledge the P. M. A. did not make a check of the material in the pile after the wreck. Any feeling I had that it wouldn't meet the specifications was my own thinking and not that of the government representatives. . . ."

Mr. Carl Elling testified that he was employed by Riddle Soil Service and did work for Riddle Quarries. He said:

". . . I was at Langley in the early part of September, 1951, after the wreck had occurred to check conditions. I carefully inspected the lime pile and found that it was spread over quite an area and had a lot more material in it, not only on top but pretty well mixed throughout the material. In my opinion the lime was unmerchantable. It might have been possible to have it salvaged but very impractical. . . .

"After this wreck occurred, I inquired at the P. M. A. office as to whether this lime was satisfactory to be spread and they okayed it. . . ."

So it appears the real trouble about selling the limestone was that it had pieces of iron and wood in it, from the burning of material upon it, which would not go through the spreaders unless that foreign material was screened out. This was regarded as impractical, or too expensive.

Defendant's witnesses Doherty, Road Master, and Ridland, Car Foreman for defendant, who were in charge of the work, testified they had the pile cut down by the bulldozer; that they didn't know what it was, who had placed it there, or what use was intended to be made of it. That when it was unloaded they thought it was grouting material to be used for the building of the Kanopolis Dam, a large dam which was then being built not far from Langley, which had not been completed in April, 1950, but which had been completed before the fire on August 14, 1951; that they had seen no one about the material since the Kanopolis Dam had been finished and thought it was material not needed and had been abandoned by whoever owned it. This evidence was not controverted. There was no claim by plaintiff that defendant had an agent, or even a depot at Langley. Questions by defendant's counsel, designed to develop the fact that defendant had no agent or representative at Langley, were objected to by plaintiff and the objections sustained.

In this court counsel for appellant argue to some extent their principal claims of error in the admission of evidence, the conclusions of fact and of law made by the court, and the failure to modify them and to make additional conclusions as requested by defendant. In the view we have reached of the disposition which should be made of the case it is not necessary to decide each of these claimed errors.

Appellant first argues that when the limestone was not removed from its property within 90 days from the date of the execution of

the General Temporary Storage License, but was permitted to stay on its premises thereafter, plaintiff's status was that of a trespasser. The following authorities are cited to sustain that view.

A trespasser is a person who enters or remains upon land in the possession of another without a privilege to do so created by the possessor's consent or otherwise. (Restatement, Torts, Sec. 329.)

In Restatement, Torts, Sec. 158, the rule is much to the same effect. There it is said: One who intentionally and without a consensual or other privilege (a) enters land in possession of another or any part thereof or causes a thing or third person so to do or (b) remains thereon, or (c) permits to remain thereon a thing which the actor or his predecessor in legal interest brought thereon in the manner stated in Sections 160 and 161, is liable as a trespasser to the other irrespective of whether harm is thereby caused to any of his legally protected interests.

In Sec. 160 of the same authority it is said: A trespass, actionable under the rule stated in Sec. 158, may be committed by the continued presence on the land of a structure, chattel or other thing which the actor or his predecessor in legal interest therein has placed thereon (a) with the consent of the person then in possession of the land, if the actor fails to remove it after the consent has been effectively terminated, or (b) pursuant to a privilege conferred on the actor irrespective of the possessor's consent, if the actor fails to remove it after the privilege has been terminated, by the accomplishment of its purpose or otherwise.

See, also, 33 Am. Jur., Licenses, Sec. 95.

Under the authorities just cited, plaintiff, after the expiration of the term provided by the written license, was a trespasser.

This is further shown by the following: Subject to the privileges of reasonable egress and removal of things (see Sections 176 to 178), the actor's privilege to enter land created by consent of the possessor thereof is terminated by the doing of any act, or the happening of any event, or the *lapse of any specified period of time* by which the consent is restricted. (Restatement, Torts, Sec. 171.)

In 38 Am. Jur., Negligence, Sec. 104, it is said: Sometimes one who enters premises as a licensee becomes a trespasser. A licensee who exceeds the permission given him becomes a trespasser and is only entitled to the observance of that duty on the part of the owner or occupant which he owes to any other trespasser. Ac-

cording to some authority, the only duty which is owed by an owner or occupant to a licensee in a position on the premises where he would not reasonably be expected to be is to abstain from willfully injuring him.

It was the view of plaintiff in the trial court and is here, that by depositing the limestone within the 90 days after the execution of the license and leaving it on after the 90-day period, it continued to be a licensee by permission or by consent of the licensor, much as a tenant of farm land who went into possession under a written lease for one year but who continued to occupy the land after the expiration of the lease with the consent of the landlord. While no authorities are cited and we have been unable to find any, it appears the case was tried upon that theory. Under that theory plaintiff could have had no greater rights than were given him by the temporary storage license.

That was a gratuitous license. The licensee paid nothing for it. It was granted for his sole benefit. His obligations to defendant were the conditions of the instrument. It was to be exercised at licensee's *sole cost* and *responsibility*. The property was to be so placed or relocated by licensee as not to interfere with, or prevent, any use to which the licensor's right of way is *then being used or is proposed to be put*, and prior to the conclusion of the term, to remove *all property stored pursuant thereto*. The licensee was to *indemnify and save harmless* the licensor from all *liability, damage* and *expenses*, which the licensee may incur or suffer *however caused and whether or not caused by the negligence of the licensor*, and the licensee covenanted to assume the risk of loss, injury or *damage by fire, however caused*, and whether or not caused by the *negligence of the licensor*. The licensee agreed to *indemnify and save harmless* the licensor of all liability for damage by *fire, however the fire may originate, the risk of which licensee assumes*.

Such provisions in a license such as is here considered, are valid. As between individuals in which the public is in no way concerned, railroads may make such contracts for storage on right of way, for the erection of buildings such as elevators, warehouses, lumber yards, and construction of spur tracks and buildings used in connection therewith. See, *Railroad Co. v. Blaker,* 68 Kan. 244, 75 Pac. 71; *Sewell v. Railway Co.,* 78 Kan. 1, 96 Pac. 1007; *Grain Co. v. Railway Co.,* 94 Kan. 590, 146 Pac. 1134; *Thirlwell v. Railway*

*Co.*, 108 Kan. 700, 196 Pac. 1068, and authorities cited in those opinions. Also, see, *Neiderhaus v. Jackson,* 79 Ind. App. 551, 137 N. E. 623; *Aetna Ins. Co. v. Atlantic Coast Line R. Co.,* 79 F. 2d 463; and, *Ringling Bros.-Barnum & Bailey C. Shows v. Olvera,* 119 F. 2d 584. Also, 12 Am. Jur., Contracts, Sections 181, 183; 22 Am. Jur., Fires, Sec. 58, *et seq.;* and cases collected in the Annotations, 48 A. L. R. 1003; 51 A. L. R. 638; and, 20 A. L. R. 2d 711.

Under the license the only circumstances under which plaintiff could recover would be for the wanton and willful injury of plaintiff. Plaintiff did not allege such conduct on the part of defendant, no evidence was produced to sustain that view, and the court made no finding to that effect.

The court found among other things that on August 14, 1951, plaintiff had about 568 tons of marketable limestone of the market value of $1,908.48. There was no evidence of market value. Plaintiff's evidence went only to the *cost* of the material. Apparently there had been no market for it for more than a year, otherwise plaintiff would have used it. Plaintiff brought the suit for actual cost, not cost plus profit, nor market value.

This was an action for conversion. In plaintiff's petition it is alleged that prior to the commencement of the action plaintiff duly demanded the delivery of the personal property in its original condition, or the fair and market value thereof, and that defendant had refused to do so. There was no evidence that such a demand was made. Had it been made perhaps defendant could have taken the bulldozer and piled the limestone again in about the shape it was at the time of the wreck, and could have screened out material which would not go through plaintiff's spreaders. It was given no opportunity to do so.

Plaintiff has ignored its obligations under the General Temporary Storage License. It did not remove the limestone within 90 days after the execution of the instrument. Plaintiff did not go about the place where the limestone was stored to see if it was so placed that it might interfere with any use defendant was then making, or proposed to make, of its right of way, and by this action it ignored the provision that its permission to use the part of the right of way was *at its sole cost and liability,* and seeks to ignore paragraph (g) where it agreed to *indemnify and save harmless* defendant from all liability *however caused* to the licensee, even though caused or contributed to by the negligence of defendant, its agents and servants. Plaintiff

also ignores the effect of paragraph (h) where it assumed the risks of all *loss, injury and damage by fire, however caused.* In spite of its own derelictions plaintiff seeks to recover upon the theory of being a "Hold over" licensee, for which no authority is presented. We think it cannot do so.

We have read all authorities cited by appellee, and more, but find no necessity of analyzing them specifically.

In view of what has been said the judgment of the trial court should be reversed with directions to render judgment for defendant. It is so ordered.

PRICE and ROBB, JJ., not participating.